1

2

3

4

5

6

7

8

9

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| DAVID LEE HARPER, SR., | Case No. 1:16-cv-00312-DAD-EPG-HC |
| Petitioner, | FINDINGS AND RECOMMENDATION RECOMMENDING DENIAL OF PETITION FOR WRIT OF HABEAS CORPUS |
| v. | |
| ROBERT FOX, | |
| Respondent. | |

11

12

13

14

15

16    Petitioner David Lee Harper, Sr., is a state prisoner proceeding *pro se* with a petition for

17 writ of habeas corpus pursuant to 28 U.S.C. § 2254. In the petition, Petitioner raises claims of

18 ineffective assistance of trial and appellate counsels and erroneous dismissal of a juror. For the

19 reasons discussed herein, the undersigned recommends denial of the petition for writ of habeas

20 corpus.

21                                              **I.**

22                                      **BACKGROUND**

23    On February 24, 2011, Petitioner was convicted by a jury in the Stanislaus County

24 Superior Court of attempted murder, shooting from a motor vehicle, and two counts of assault

25 with a firearm. (3 CT[1] 575–78). Petitioner was sentenced to an imprisonment term of thirty-nine

26 years to life plus a consecutive term of twenty-three years. (3 CT 625–28; 7 RT[2] 1799–1800). On

27

---

28

[1] "CT" refers to the Clerk's Transcript on Appeal lodged by Respondent on June 23, 2016. (ECF No. 15).
[2] "RT" refers to the Reporter's Transcript on Appeal lodged by Respondent on June 23, 2016. (ECF No. 15).

1  June 26, 2014, the California Court of Appeal, Fifth Appellate District affirmed the judgment.

2  People v. Harper, No. F064498, 2014 WL 2886291 (Cal. Ct. App. June 26, 2014). On September

3  17, 2014, the California Supreme Court denied the petition for review. (LDs[3] 5, 6). Petitioner

4  invoked one complete round of post-conviction collateral review. Petitioner was denied relief at

5  all levels. (LDs 7–12).

6        On March 3, 2016, Petitioner commenced the instant proceedings by filing a federal

7  habeas petition, which alleges the following claims for relief: (1) ineffective assistance of trial

8  counsel; (2) ineffective assistance of appellate counsel; and (3) erroneous dismissal of a juror.

9  (ECF No. 1). Respondent filed an answer, and Petitioner filed a traverse. (ECF Nos. 14, 18).

10  **II.**

11  **STATEMENT OF FACTS[4]**

12  This case is the result of a drive-by shooting where the victim, a 20–month–old
child, was shot and gravely injured. Although disputed at trial, the jury

13  determined defendant was the person who fired the shots. The evidence
establishing defendant as the shooter included two eyewitness identifications. The

14  vehicle used in the shooting was distinctive. It belonged to one of defendant's
sisters and was normally driven by defendant's brother. Defendant, along with his

15  brother and Roneel Prasad, painted the vehicle in the hours following the
shooting. Also, defendant altered his appearance by cutting his hair immediately

16  after the shooting. Additionally, Prasad, who was married to one of defendant's
sisters, testified against defendant after being convicted of being an accessory for

17  his involvement in this case. As a result of Prasad's plea to his involvement in the
case, he was going to be deported. He stated he did not receive any leniency as a

18  result of his agreement to testify against defendant.

19  Prasad testified defendant admitted the shooting to him and later sent him several
threatening notes while the two were in custody together. He described the notes

20  as "kites," which are messages written on small pieces of paper and used by
inmates to covertly communicate with each other. The kites told Prasad to "keep

21  his mouth shut," and indicated he or his family could be harmed. Prasad further
testified defendant and his brother approached him shortly after the shooting,

22  defendant brandished a revolver and demanded Prasad give them a ride, and
defendant discarded shell casings out the window of the car during the ride.

23  According to the evidence the intended target of the shooting, Ramiro Serna,

24  fought with defendant two weeks prior and cut defendant's face. Prasad testified
defendant had contact with Serna, and the two agreed not to testify against each

25  other in their respective cases. Defendant and his brother also came up with a plan
to blame the shooting on James Barrett.

26

27  [3] "LD" refers to the documents lodged by Respondent on June 23, 2016. (ECF No. 15).

28  [4] The Court relies on the California Court of Appeal's June 26, 2014 opinion for this summary of the facts of the
crime. See Vasquez v. Kirkland, 572 F.3d 1029, 1031 n.1 (9th Cir. 2009).

The defense disputed the prosecution's evidence and claimed James Barrett, the boyfriend of defendant's sister, was the shooter. In support, the defense produced evidence that two members of the victim's family identified Barrett as the shooter when shown a single photograph by a defense investigator approximately two years after the shooting. One of the family members had previously identified defendant as the shooter from a photographic lineup. The other eyewitness who identified defendant as the shooter had charges pending against him at the time he came forward with the information regarding defendant. Pursuant to an agreement with the prosecution, he was allowed to enter a plea for a two-year prison term, although his prison exposure was as much as nine years and eight months. Defendant's wife provided defendant with an alibi at trial, although her testimony regarding the alibi and changing his appearance were inconsistent with prior statements she had made to the police. Serna denied defendant was the one who shot at him. He further denied cutting defendant's face two weeks earlier, although he admitted to pleading guilty to that offense. A handwriting expert testified the kites Prasad identified as being authored by defendant were written by at least two different individuals, or possibly three. Additionally, the defense challenged Prasad's credibility, arguing he was not telling the truth about his conversations with defendant, and theorizing he could have written the kites to gain favor with the district attorney's office.

Although the jury heard approximately 10 days' worth of testimony and was tasked with deciding several charges and enhancements, the jury returned its guilty verdicts after approximately two and one-half hours of deliberations.

Harper, 2014 WL 2886291, at *1–2.

### III.

### STANDARD OF REVIEW

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution. The challenged convictions arise out of the Stanislaus County Superior Court, which is located within the Eastern District of California. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997) (en banc). The instant petition was filed after the enactment of AEDPA and is therefore governed by its provisions.

Under AEDPA, relitigation of any claim adjudicated on the merits in state court is barred unless a petitioner can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); Davis v. Ayala, 135 S. Ct. 2187, 2198 (2015); Harrington v. Richter, 562 U.S. 86, 97–98 (2011); Williams, 529 U.S. at 413. Thus, if a petitioner's claim has been "adjudicated on the merits" in state court, "AEDPA's highly deferential standards" apply. Ayala, 135 S. Ct. at 2198. However, if the state court did not reach the merits of the claim, the claim is reviewed de novo. Cone v. Bell, 556 U.S. 449, 472 (2009).

In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412. In addition, the Supreme Court decision must "'squarely address[] the issue in th[e] case' or establish a legal principle that 'clearly extend[s]' to a new context to the extent required by the Supreme Court in . . . recent decisions"; otherwise, there is no clearly established Federal law for purposes of review under AEDPA and the Court must defer to the state court's decision. Moses v. Payne, 555 F.3d 742, 754 (9th Cir. 2008) (alterations in original) (quoting Wright v. Van Patten, 552 U.S. 120, 125, 123 (2008)).

If the Court determines there is clearly established Federal law governing the issue, the Court then must consider whether the state court's decision was "contrary to, or involved an unreasonable application of, [the] clearly established Federal law." 28 U.S.C. § 2254(d)(1). A state court decision is "contrary to" clearly established Supreme Court precedent if it "arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." Williams, 529 U.S. at 413. A state court decision involves "an unreasonable application of[] clearly established Federal law" if "there is no possibility

fairminded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents." Richter, 562 U.S. at 102. That is, a petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Id. at 103.

If the Court determines that the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law," and the error is not structural, habeas relief is nonetheless unavailable unless it is established that the error "had substantial and injurious effect or influence" on the verdict. Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (internal quotation mark omitted) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)).

AEDPA requires considerable deference to the state courts. Generally, federal courts "look through" unexplained decisions and review "the last related state-court decision that does provide a relevant rationale," employing a rebuttable presumption "that the unexplained decision adopted the same reasoning." Wilson v. Sellers, 138 S. Ct. 1188, 1192 (2018). This presumption may be rebutted "by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision, such as alternative grounds for affirmance that were briefed or argued to the state supreme court or obvious in the record it reviewed." Id.

"When a federal claim has been presented to a state court[,] the state court has denied relief," and there is no reasoned lower-court opinion to look through to, "it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Richter, 562 U.S. at 99. Where the state court reaches a decision on the merits and there is no reasoned lower-court opinion, a federal court independently reviews the record to determine whether habeas corpus relief is available under § 2254(d). Walker v. Martel, 709 F.3d 925, 939 (9th Cir. 2013). "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). The federal court must review the state court

record and "must determine what arguments or theories . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." Richter, 562 U.S. at 102.

## IV.

## DISCUSSION

### A. Ineffective Assistance of Counsel

In his first, second, and third claims for relief, Petitioner asserts ineffective assistance of trial and appellate counsels on various grounds. (ECF No. 1 at 7–16).[5] Respondent argues that the state courts' denial of the ineffective assistance of counsel claims was reasonable. (ECF No. 14 at 8, 13).

### 1. Strickland Legal Standard

The clearly established federal law governing ineffective assistance of counsel claims is Strickland v. Washington, 466 U.S. 668 (1984), which requires a petitioner to show that (1) "counsel's performance was deficient," and (2) "the deficient performance prejudiced the defense." Id. at 687. To establish deficient performance, a petitioner must demonstrate that "counsel's representation fell below an objective standard of reasonableness" and "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. at 688, 687. Judicial scrutiny of counsel's performance is highly deferential. A court indulges a "strong presumption" that counsel's conduct falls within the "wide range" of reasonable professional assistance. Id. at 687. To establish prejudice, a petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. A court "asks whether it is 'reasonable likely' the result would have been different. . . . The likelihood of a different result must be substantial, not just conceivable." Richter, 562 U.S. at 111–12 (citing Strickland, 466 U.S. at 696, 693).

---

[5] Page numbers refer to the ECF page numbers stamped at the top of the page.

When § 2254(d) applies, "[t]he pivotal question is whether the state court's application of the Strickland standard was unreasonable. This is different from asking whether defense counsel's performance fell below Strickland's standard." Richter, 562 U.S. at 101. Moreover, because Strickland articulates "a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." Knowles v. Mirzayance, 556 U.S. 111, 123 (2009) (citing Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). "The standards created by Strickland and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." Richter, 562 U.S. at 105 (citations omitted). Thus, "for claims of ineffective assistance of counsel . . . AEDPA review must be 'doubly deferential' in order to afford 'both the state court and the defense attorney the benefit of the doubt.'" Woods v. Donald, 135 S. Ct. 1372, 1376 (2015) (quoting Burt v. Titlow, 571 U.S. 12, 15 (2013)). When this "doubly deferential" judicial review applies, the appropriate inquiry is "whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." Richter, 562 U.S. at 105.

### 2. Advising Petitioner to Reject Favorable Plea Offer

In his first claim for relief, Petitioner asserts that trial counsel was ineffective for advising Petitioner to reject a favorable plea offer. (ECF No. 1 at 7–8). This claim was raised in all three of Petitioner's state habeas petitions. (LDs 7, 9, 11). The Stanislaus County Superior Court denied relief on the merits in a reasoned decision. (LD 8). In denying Petitioner's ineffective assistance of counsel claim regarding rejecting a favorable plea offer, the California Court of Appeal stated:

> The "Petition for Writ of Habeas Corpus," filed on March 18, 2015, is denied without prejudice. All of the facts petitioner relies upon are contained in the attachments, which are not declared to be true under penalty of perjury. Also, petitioner's summary of what transpired at the Marsden hearing is conclusional. (*People v. Duvall* (1995) 9 Cal.4th 464, 474.)

(LD 10). Instead of addressing the deficiencies identified in the order and returning to the California Court of Appeal, Petitioner filed a state habeas petition in the California Supreme Court. Petitioner declared under penalty of perjury that "all the evidence used in this petition for

writ of habeas corpus [is] real and true." (LD 11). The California Supreme Court summarily denied the petition. (LD 12).

Generally, federal courts "look through" summary denials and review "the last related state-court decision that does provide a relevant rationale." <u>Wilson</u>, 138 S. Ct. at 1192. As the state habeas petition filed in the California Supreme Court corrected the deficiencies identified in the California Court of Appeal's order, the Court will "look through" the California Supreme Court's summary denial and examine the decision of the Stanislaus County Superior Court. <u>See</u> <u>Wilson</u>, 138 S. Ct. at 1192 (noting that "the State may rebut the presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision, such as alternative grounds for affirmance that were briefed or argued to the state supreme court or obvious in the record it reviewed").

In denying Petitioner's ineffective assistance of counsel claim for advising Petitioner to reject a favorable plea offer, the Stanislaus County Superior Court stated:

> Petitioner claims his trial counsel was ineffective because he was advised "to reject a favorable plea offer". In order to prevail in a clam of ineffective assistance of counsel, Petitioner must demonstrate that (1) trial counsel's representation fell below an objective standard of reasonableness and that (2) there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different. (Strickland v. Washington (1984) 466 US 668.) Here, appellant has failed to establish both required elements.
>
> Petitioner bears the burden of stating facts sufficient to justify relief.
>
> Petitioner alleges that he rejected a "favorable plea deal" based on the erroneous advice of counsel. Where a defendant rejects a plea bargain upon erroneous advice of counsel and is convicted at trial, the defendant must show that but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court (i.e., that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances), that the court would have accepted its terms, and that the conviction of sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence than under the judgment and sentence that in fact were imposed. Lafler v. Cooper, 132 S. Ct 1376.
>
> He cites as erroneous advice his trial counsel's recommendation that he not accept the People's pre-trial offer of "20 to 25 years" because he would "be an old man" and perceived weaknesses in the peoples [*sic*] case. Petitioner claims he then "allowed negotiations to end" and did not attempt to re-open negotiations until the defense had suffered an unfavorable ruling following a 402 hearing. At no time does Petitioner identify any legal error made by counsel that resulted in the a [*sic*] loss of a plea bargain. Additionally, Petitioner describes a process of negotiations

were [*sic*] the possibility of settlement was discussed but no specific plea bargain was ever offered or rejected. how [*sic*], but for the erroneous advice, the outcome of the proceeding would have been different.

(LD 8).

The Supreme Court has applied the <u>Strickland</u> analysis to ineffective assistance claims arising from the plea process. <u>See</u> <u>Lafler v. Cooper</u>, 566 U.S. 156, 162–63 (2012); <u>Missouri v. Frye</u>, 566 U.S. 134, 140 (2012); <u>Hill v. Lockhart</u>, 474 U.S. 52, 57 (1985). Here, the Stanislaus County Superior Court correctly identified <u>Lafler</u> as governing Supreme Court precedent. In <u>Lafler</u>, the Supreme Court addressed the situation where ineffective advice led to the rejection of a plea offer and held:

> In these circumstances a defendant must show that but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court (*i.e.,* that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances), that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed.

<u>Lafler</u>, 566 U.S. at 164.

In <u>Turner v. Calderon</u>, 281 F.3d 851 (9th Cir. 2002), the Ninth Circuit addressed an ineffective assistance claim with respect to trial counsel's advice regarding a plea offer in a case governed by AEDPA. <u>Id.</u> at 863, 879–81. The Ninth Circuit stated that in "ineffectiveness of counsel in plea situations . . . the question [is] not whether 'counsel's advice [was] right or wrong, but . . . whether that advice was within the range of competence demanded of attorneys in criminal cases.'" <u>Id.</u> at 880 (second alteration in original) (quoting <u>McMann v. Richardson</u>, 397 U.S. 759, 771 (1970)). <u>Turner</u> held that to establish a claim of ineffective assistance of counsel in plea situations, a defendant "must demonstrate gross error on the part of counsel." 281 F.3d at 880 (internal quotation marks omitted) (quoting <u>McMann</u>, 397 U.S. at 772).

The superior court's determination that no specific plea bargain was ever offered or rejected was not objectively unreasonable. After the jury convicted Petitioner of the substantive charges but before trial on his prior convictions, the trial court held a hearing on Petitioner's motion to replace counsel. At the hearing, Petitioner complained *inter alia* about defense

9

counsel's advice regarding plea negotiations. (ECF No. 1 at 487). Petitioner explained that trial counsel informed him the prosecutor wanted to offer him a deal and asked what he was willing to take. Petitioner directed counsel to offer ten years, and he got the impression that the prosecutor rejected that offer. (Id. at 487–88). Petitioner claimed that in the middle of trial he directed defense counsel to offer the prosecution fifteen years "because some things aren't going right." (Id. at 489). Counsel advised him the prosecutor would not consider anything less than twenty. Petitioner declared that he was eager to negotiate and directed counsel to offer twenty years, but counsel never communicated that offer. (Id. at 489–90). Petitioner alleged that defense counsel advised against accepting an offer because: it was too much time and Petitioner would be an old man when he got out, there was the possibility of a new trial, and there was still a chance of prevailing at trial. (Id. at 489).

In response, defense counsel informed the trial court that "[t]here was never an actual offer made by the district attorney's office at any point in time in this case." (ECF No. 1 at 514). However, there were some informal communications regarding pleas, described by defense counsel as follows:

> Ms. Ferreira [the prosecutor] said to me—in the context of seeing Mr. Harper's scar on his face and believing that Mr. Serna had put it there and Ms. Ferreira's belief that he had retaliated, said, "I felt sorry for him," and has there ever been a plea bargain offer in this case, and I said, "No, let's talk."
>
> And she said, "Well, I can't go upstairs" were her words, "for anything less than 25 to 30 years." And I brought that idea to Mr. Harper, and he said, "No." And I felt throughout the trial really that we had some reasonable doubt in this case, and so it wasn't one of those cases where I strongly recommended taking any offer whatsoever.
>
> . . .
>
> [Mr. Harper] had made an offer of 10 finally. I said she won't think about 10—not when we started out with 25 to 30.
>
> This is fairly late in the trial, and I think we threw around 20 to 25, but it was extremely informal, and the understanding throughout was that she had to go to her supervisors for permission because this was a life case. She couldn't—on the spot she didn't have authority to negotiate on that level, and then trial suddenly just finished off about that day, so that day or the very next morning or something like that.

10

> . . . there was no—there were no communications by telephone or
> e-mail among us—between us, I should say—between Ms. Ferreira
> and I trying to settle this case at that point.
>
> And if there had been something that seemed real on the table to
> work with, I would have been frantically going back and forth with
> it, but there was nothing concrete.

(ECF No. 1 at 514–16). Defense counsel further clarified for the trial court that the prosecutor "had made her position of 25 to 30 very clear from the beginning, and . . . I had no clear indication that she was willing to drop." (Id. at 516).

Petitioner was given an opportunity to rebut defense counsel's explanation. He alleged that despite his concerns about how the trial was progressing, counsel advised against a plea agreement for twenty to twenty-five years. Petitioner claimed that counsel stated, "You'll be an old man if you take it, and it will mess up our new trial," and indicated that it would interfere with Petitioner's appeal. (ECF No. 1 at 521). Petitioner disputed counsel's representation to the trial court that there was never an actual offer made because he believed that if the prosecutor "feels sorry for me, she was willing to get a deal for me." (Id. at 522). However, Petitioner conceded that his belief was "speculation." (Id.). In response to the trial court's comment that the speculative offer might not have been one acceptable to Petitioner, Petitioner stated, "That's understandable, but we don't know because [counsel] never put forth trying to get me a deal[.]" (ECF No. 1 at 522).

Lafler held that "a defendant must show that but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court (*i.e.*, that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances)." 566 U.S. at 164. Here, the state court was not unreasonable in concluding that Petitioner did not show that a plea offer would have been presented to the trial court but for the allegedly deficient advice of defense counsel. It appears that the prosecutor informally proposed a range of twenty-five to thirty years. Although Petitioner informed the trial court that he had directed counsel to offer twenty years, the prosecutor apparently did not have authority to negotiate specific details of a plea bargain and

"the understanding throughout was that she had to go to her supervisors for permission because this was a life case." (ECF No. 1 at 516). Moreover, Petitioner conceded that his belief that the prosecutor was "willing to get a deal" for him was "speculation." (ECF No. 1 at 522).

The Ninth Circuit has recognized that "[c]ounsel cannot be required to accurately predict what the jury or court might find." Turner, 281 F.3d at 881. Although the decision to proceed to trial unfortunately resulted in an unfavorable verdict for Petitioner, "counsel [is] not constitutionally defective because he lacked a crystal ball." Id. Therefore, under the "doubly deferential" AEDPA review of ineffective assistance of counsel claims, the state court's denial with respect to counsel's plea negotiation advice was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of fact. The decision was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103. Accordingly, Petitioner is not entitled to habeas relief on his first claim, and it should be denied.

### 3. Ineffective Assistance of Appellate Counsel

In his second claim for relief, Petitioner asserts that appellate counsel was ineffective for failing to raise a claim of ineffective assistance of trial counsel regarding the plea negotiation process. (ECF No. 1 at 13). This claim was raised in all three of Petitioner's state habeas petitions. As set forth in section IV(A)(2), *supra*, the Court will "look through" the California Supreme Court's summary denial and examine the decision of the Stanislaus County Superior Court.

In denying Petitioner's ineffective assistance of appellate counsel claim, the Stanislaus County Superior Court stated:

> Petitioner alleges that Appellate Counsel provided ineffective assistance by refusing to advance the claims outlined above on direct appeal. Again, Petitioner fails to demonstrate that counsel's representation fell below the standard of reasonableness and that but for counsel's unprofessional errors, the result of the proceeding would have been different. (Strickland v. Washington (1984) 466 US 668.)

(LD 8).

The Supreme Court has held that appellate counsel does not have a constitutional obligation to raise every nonfrivolous issue on appeal. Jones v. Barnes, 463 U.S. 745, 754 (1983). Rather, the "process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." Smith v. Murray, 477 U.S. 527, 536 (1986) (quoting Jones, 463 U.S. at 751–52). As discussed in section IV(A)(2), *supra*, this Court has found the state court reasonably concluded that trial counsel was not ineffective with respect to plea negotiations. Therefore, Petitioner has not established that there is "a reasonable probability that . . . the result of the proceeding would have been different" had appellate counsel raised a trial-counsel-based ineffective assistance claim regarding the plea negotiation process on direct appeal. Strickland, 466 U.S. at 694.

Based on the foregoing, under the "doubly deferential" AEDPA review of ineffective assistance of counsel claims, the state court's denial was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of fact. The decision was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103. Accordingly, Petitioner is not entitled to habeas relief on his second claim, and it should be denied.

### 4. Failure to Request Instruction

In his third claim for relief, Petitioner asserts that trial counsel was ineffective for failing to request an instruction that the jury was to determine whether the prosecution had established the preliminary fact of the authenticity of the "kites." (ECF No. 1 at 14). Respondent does not address this claim in the answer.

This claim was raised on direct appeal to the California Court of Appeal, Fifth Appellate District, which denied the claim in a reasoned decision. The claim also was raised in the petition for review, which the California Supreme Court summarily denied. As federal courts review the last reasoned state court opinion, the Court will "look through" the summary denial and examine the decision of the California Court of Appeal. See Wilson, 138 S. Ct. at 1192.

In denying the ineffective assistance of counsel claim for failure to request an instruction, the California Court of Appeal stated:

## II. Defendant Was Not Denied Effective Assistance of Counsel

On the first day of trial, the prosecution moved in limine to admit the threatening kites authored by defendant while in jail. The defense sought to exclude the writings, claiming the prosecution had not authenticated the writings. Specifically, the defense argued the kites "appear to have been authored by at least two different individuals," and the kites had never been examined by a handwriting expert.

In addressing the issue in limine, the trial court inquired as to whether the prosecutor would be able to lay the proper foundation for the admission of the kites. The prosecutor indicated she would, arguing the "foundation can be laid though Roneel Prasad in terms of writing and the receipt thereof. The content would speak for itself." She further explained "the authentication of handwriting can be done by a lay person and lay opinion, it doesn't require expert testimony, and that's well-settled case law." Defense counsel disagreed, contending the prosecutor could not properly authenticate the writings through a lay witness in this case. The court explained it wanted to determine whether an Evidence Code section 402 hearing was going to be necessary on the matter rather than simply allowing the prosecutor to attempt to lay the foundation during trial and then ruling on the issue with a proper objection. Defense counsel noted her in limine motion outlined the issue and informed the court she would seek a formal Evidence Code section 402 hearing where she could present testimony from her expert on the matter. The court explained that any hearing could be conducted the following day.

The following day, defense counsel presented her expert, Marcel Matley. After his expertise was established, Matley opined the kites he reviewed were written by two different people, and possibly as many as three or four. The prosecutor asked that defense counsel provide a report from Matley since she had not been provided one as of that time. The prosecutor asked if the court had determined whether the kites would be admitted, and the court stated that as it had not yet heard all of the arguments, the matter would be deferred until a later time. As such, the parties were instructed not to mention the writings in their opening statements or during evidence until the court had time to rule on the issue.

During the presentation of the evidence, the prosecutor asked Prasad if he recognized the contested kites. After responding he did, defense counsel objected and the parties discussed the matter off the record. Subsequently, out of the jury's presence, the court conducted an Evidence Code section 402 hearing to determine the admissibility of the kites. During the hearing, Prasad testified he was familiar with defendant's handwriting from being housed with him at the jail when they would stay up and work on the case. Additionally one of the kites was signed "young Dav," which is how defendant referred to himself. Defense counsel argued the kites should not be admitted because her retained expert had opined they were written by two or more people, therefore, the evidence was not "reliable." At the end of the hearing, the trial court concluded the documents had been adequately authenticated by the prosecution and were, therefore, admissible.

Subsequently, defense counsel moved for a mistrial, arguing the prosecutor committed misconduct by eliciting the evidence regarding the kites, and the trial court abused its discretion by admitting the kites. The motion was denied as was

defendant's writ to this court that reiterated the same arguments. (*Harper v. Superior Court* (Feb. 25, 2011) F061824.) Defendant now abandons these arguments on appeal and instead argues his counsel was ineffective for failing to request an instruction that the jury was required to disregard the kites unless it first found defendant was in fact the author of the kites. We find no error.

Defendant's contention centers upon his counsel's failure to request an instruction informing the jury it must first determine the preliminary fact of the authenticity of the kites before it could consider the kites as evidence against defendant. While a trial court is under no duty to give such an instruction sua sponte, it is required to give such an instruction upon request. (Evid.Code, § 403, subd. (c)(1); *People v. Lewis* (2001) 26 Cal.4th 334, 362–364.) Indeed, Evidence Code section 403, subdivision (c)(1) provides that where the admission of evidence is dependent upon proof of a preliminary fact, upon admission of the evidence, the court "[m]ay, and on request shall, instruct the jury to determine whether the preliminary fact exists and to disregard the proffered evidence unless the jury finds that the preliminary fact does exist." Here Evidence Code section 403 clearly applies to the preliminary fact of the authenticity of the kites. Had defense counsel requested an instruction pursuant to this section, the court was required to provide it. The question this court must address is whether counsel's failure to request such an instruction constituted ineffective assistance of counsel. We conclude it did not.

"Under both the Sixth Amendment to the United States Constitution and article I, section 15, of the California Constitution, a criminal defendant has the right to the assistance of counsel." (*People v. Ledesma* (1987) 43 Cal.3d 171, 215.) To establish ineffective assistance of counsel, " 'a defendant must show both that his counsel's performance was deficient when measured against the standard of a reasonably competent attorney and that counsel's deficient performance resulted in prejudice to defendant....' " (*People v. Lewis* (2001) 25 Cal.4th 610, 674.) However, "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies.... If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." (*Strickland v. Washington* (1984) 466 U.S. 668, 697.) Here we need not decide whether counsel provided ineffective assistance as we find defendant has failed to demonstrate any prejudice from the alleged error.

In order to demonstrate prejudice, defendant must show that it is reasonably probable he would have received a more favorable result had his counsel requested the instruction. (*People v. Lewis* (1990) 50 Cal.3d 262, 288.) Defendant cannot show prejudice where, as here, the instructions adequately informed the jury regarding the authenticity of the kites.

We note there are situations where the necessity of determining a preliminary fact is so clear that an instruction on the issue is unnecessary. Indeed, the comment to Evidence Code section 403 by the Assembly Committee on the Judiciary states:

> "Frequently, the jury's duty to disregard conditionally admissible evidence when it is not persuaded of the existence of the preliminary fact on which relevancy is conditioned is so clear that an instruction to this effect is unnecessary. For example, if the disputed preliminary fact is the authenticity of a deed, it hardly seems necessary to instruct the jury to disregard the deed if it should find that the deed is not genuine. No rational jury could find the deed to be spurious and, yet, to be still

effective to transfer title from the purported grantor." (Assem. Com. on Judiciary com., 29B pt. 1B West's Ann. Evid.Code (2011 ed.) foll. § 403, p. 21; cf. *People v. Simon* (1986) 184 Cal.App.3d 125, 130, fn. 3 [in cases admitting prior act evidence where defendant contests committing prior acts "it is generally unnecessary to instruct the jurors that if they believe the defendant, the prior act evidence should be disregarded; clearly if the defendant cannot be connected to the prior act, admission of evidence concerning it will not normally prejudice him."].)

Likewise here, where the issue as to the author of the kites was hotly contested, it is highly unlikely the jury did not understand it must first determine whether defendant wrote the kites before considering them as evidence against him. Defense counsel challenged the authenticity of the kites by bringing in an expert to say they were written by more than one person. Additionally, defense counsel cross-examined Prasad on the issue of the authenticity of the kites, challenging his testimony that all the kites came from the same person. Defense counsel also challenged Prasad's familiarity with defendant's handwriting. Defense counsel pointed out Prasad had access to the discovery in the case and therefore knew the details and could have written the kites himself. During closing argument, defense counsel challenged Prasad's ability to recognize defendant's handwriting and pointed out the expert's testimony that the kites were written by at least two different individuals. She further argued Prasad lied when he said the kites were written by defendant. Counsel hypothesized Prasad had in fact written the kites on his own to deflect attention from himself and to gain favor with the district attorney's office. In response, the prosecutor challenged the expert's opinion regarding the kites, explaining he had never compared the kites to any known handwriting exemplars to say who wrote them. In addition, the prosecutor pointed out a document found in defendant's cell had examples of different handwriting styles on it and also used language similar to that found in the kites.

It is apparent from the trial testimony and closing arguments that the defense challenged the authenticity of the kites. In doing so, counsel alerted the jury to its argument the kites were not written by defendant. Although no specific instruction was given telling the jury it could only consider the kites if it first determined they were written by defendant, this was apparent through the arguments. (*People v. Marshall* (1996) 13 Cal.4th 799, 833–834 [finding "no possibility the jury could have misunderstood its obligation to assess the relevancy of the reconstruction photographs" where counsel argued reconstruction photographs inaccurately displayed conditions].)

Furthermore, several instructions alerted the jury it must first determine whether defendant authored the kites before considering them against him. The jury was specifically instructed that it "heard evidence that the defendant made oral or written statements before the trial. *You must decide whether the defendant made any of these statements in whole or in part.* If you decide that the defendant made such statements, consider the statements along with all the other evidence in reaching your verdict." (Italics added.) The jury was further instructed that if "the defendant tried to hide evidence or discourage someone from testifying against him, that conduct may show that he was aware of his guilt. *If you conclude that the defendant made such an attempt,* it is up to you to decide its meaning and importance. However, evidence of such an attempt cannot prove guilt by itself." (Italics added.) Moreover, the jury was instructed that if it determined there was a "conflict in the evidence, you must decide what evidence, if any, to believe." The jury was also fully instructed regarding how to evaluate the credibility of

witnesses, how to evaluate both lay and expert opinion, and the requirement of corroboration of accomplice testimony should it find Prasad was an accomplice.

The instructions as a whole plainly told the jury it had to decide whether the kites were written by defendant and that if it determined the kites were written by him, it could consider them with the other evidence. In *People v. Lewis, supra,* 26 Cal.4th 334, our high court held there was no sua sponte duty to instruct the jury that it must disregard evidence where it found the preliminary fact untrue. In reaching that conclusion, the court explained such an instruction "would merely have told the jury the obvious: that if it found [the witness] could not perceive or recollect, ... then the jury should disregard his testimony. Our faith in the common sense of jurors weighs against requiring a trial court to give such instruction sua sponte." (*Id.* at p. 362.) The court further rejected the defendant's alternative ineffective assistance of counsel claim as there was "no reasonable likelihood of prejudice in that the instructions would not have provided necessary guidance to the jurors." (*Id.* at p. 363.)

Likewise here, we conclude the instruction defendant now seeks would have done nothing more than state the obvious: Before the jury could consider the writings as evidence against defendant, it would have to determine they were authored by him. Given defense counsel's cross-examination on the subject, the presentation of an expert witness stating the kites were not written by the same person, and her argument that the kites were not written by defendant, the jury could not have missed the point. In addition, the jury was expressly told it must determine whether statements attributed to defendant were made by him before considering the statements. Given the evidence, arguments, and instructions as a whole, there is no reasonable possibility the jury failed to understand the necessity of determining the kites' authenticity before considering the evidence. Thus, defendant was not prejudiced by the failure to request any additional instruction on the matter. (See *People v. Smithey* (1999) 20 Cal.4th 936, 985–987 [no prejudice from failure to request a pinpoint instruction where jury was adequately instructed as to the relevant law]; *People v. Castillo* (1997) 16 Cal.4th 1009, 1014–1017 [rejecting claim of ineffective assistance where counsel did not request pinpoint instruction where instructions as a whole were not misleading and did not hinder defense argument].)

To the extent defendant argues he was prejudiced because the jury was not instructed it was required to find the proof of the preliminary fact beyond a reasonable doubt, he is mistaken. The proper standard as to the proof of a preliminary fact is by a preponderance of the evidence. (*People v. Marshall, supra,* 13 Cal.4th at pp. 832–833; *People v. Herrera* (2000) 83 Cal.App.4th 46, 61; *People v. Simon, supra,* 184 Cal.App.3d at p. 134.) Thus defendant's arguments the instructions failed to adequately state the burden of proof are inapplicable.

Finally, we reject defendant's assertion the jury could have somehow shifted the burden of proof to the defense. The jury was fully instructed regarding the proof beyond a reasonable doubt standard and the People's burden of establishing the offense beyond a reasonable doubt. Additionally, both the prosecutor and the defense informed the jury during closing arguments that the burden of proof rested solely with the prosecution.

During closing arguments, the prosecutor stated: "*I want to stress upon you that I have the burden of proof.* And I take that very seriously. I don't shrug that off, I don't pass that to anyone else. As I stand here before you today, I accept that

responsibility of proving each and every count and allegation beyond a reasonable doubt against [defendant]." (Italics added.) She reiterated this later, noting she "accepted the responsibility that [the elements] must be proven beyond a reasonable doubt." Again, in her rebuttal argument, the prosecutor stated, "*I have the burden of proof in this case. And that is why I get to do a rebuttal argument*, because that burden rests on me to prove this case beyond a reasonable doubt." (Italics added.) Defense counsel also noted during her closing that the People bore the burden of proof. Nothing in the instructions either singly or as a whole would lead the jurors to conclude it was the defense's burden to disprove authenticity of the writings. While the defense disputed the authenticity through the cross-examination of Prasad and the presentation of Matley's testimony, the burden of proof was squarely and repeatedly placed on the prosecution. Defendant points to nothing in the record nor makes any argument demonstrating how the jury would have shifted to the defense the burden of proof on the issue. Based on the instructions as a whole, we find no such reasonable probability exists. Therefore, defendant's claim must be rejected.

Harper, 2014 WL 2886291, at *8–12.

"[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." Strickland, 466 U.S. at 697. Here, the state court was not objectively unreasonable in determining that Petitioner had not established that "there is a reasonable probability that . . . the result of the proceeding would have been different" if counsel had requested an instruction that the jury was to determine whether the prosecution had established the preliminary fact that Petitioner had authored the kites. Id. at 694.

The authenticity of the kites was an issue that was given considerable attention throughout trial and in closing argument. At trial, the defense called an expert witness who opined that the kites were written by two, possibly three, people and that the kites written with a left slant were a disguise. (5 RT 1296, 1299). Defense counsel also cross-examined Roneel Prasad specifically about the kites and the foundation for Prasad's testimony that they were written by Petitioner. (1 RT 256–60; 2 RT 298–99, 301–08, 332–34). In her closing argument, defense counsel specifically addressed the authorship of the kites by disputing prosecution witness Kirk Bunch's expert analysis, questioning the basis of Prasad's knowledge of Petitioner's handwriting and Prasad's motive for testifying, and reinforcing defense expert Mr. Matley's testimony. (6 RT 1605–09). Defense counsel concluded, "I submit to you that when

18

Roneel Prasad said David Harper wrote all those notes, all those threats, he was not telling you the truth." (6 RT 1609). Furthermore, with respect to evidence that Petitioner made oral or written statements before the trial, the jury was specifically instructed, "*You must decide whether the defendant made any of these statements in whole or in part.* If you decide that the defendant made such statements, consider the statements along with all other evidence in reaching your verdict." (6 RT 1528; 3 CT 549) (emphasis added).

In light of the evidence adduced at trial, the closing arguments, and the jury instructions as a whole, it was reasonable for the state court to conclude that "it is highly unlikely the jury did not understand it must first determine whether defendant wrote the kites before considering them as evidence against him." Harper, 2014 WL 2886291, at *10. The California Court of Appeal's denial of Petitioner's ineffective assistance of counsel claim for failing to request an authenticity of the kites instruction was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of fact. The decision was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103. Accordingly, Petitioner is not entitled to habeas relief on his third claim, and it should be denied.

**B. Dismissal of Juror No. 7**

In his fourth claim for relief, Petitioner asserts that the trial court's dismissal of Juror No. 7 was erroneous and violated Petitioner's Sixth Amendment right to jury trial and Fourteenth Amendment right to due process of law. (ECF No. 1 at 17). Respondent does not address this claim in the answer.

This claim was raised on direct appeal to the California Court of Appeal, Fifth Appellate District, which denied the claim in a reasoned decision. The claim also was raised in the petition for review, which the California Supreme Court summarily denied. As federal courts review the last reasoned state court opinion, the Court will "look through" the summary denial and examine the decision of the California Court of Appeal. See Wilson, 138 S. Ct. at 1192.

In denying Petitioner's challenge to the dismissal of Juror No. 7, the California Court of Appeal stated:

**I. The Removal of Juror No. 7 Was Harmless**

Defendant argues at length that the trial court's removal of Juror No. 7 after learning a member of defendant's extended family had contact with the juror constituted error. He claims the trial court failed to conduct an adequate inquiry into the matter, and its reasons for excusing the juror were insufficient.

*Background*

Near the end of trial, the prosecutor informed the court and defense counsel that she had just been made aware of a telephone call between defendant and Millie Garcia.[6] This call took place the evening before and had been tape-recorded. She had not listened to the tape at that time; however, she had been informed defendant may have made some admissions during the call.

In addition, the prosecutor informed the court that a member of defendant's family, Anthony,[7] had been observed having a conversation with Juror No. 7 before the proceedings that morning by Investigator Kirk Bunch. Bunch explained that on his way to court, he observed Anthony speaking with Juror No. 7. After learning this information, the court held a closed hearing to inquire into the matter with the juror and the investigator.

During the hearing the court described Anthony to Juror No. 7, who then stated he "asked me for a cigarette and I gave him a couple of cigarettes. That's it." Juror No. 7 explained she had been in her truck, parked outside of the courthouse, and was taking her insulin when Anthony approached and asked her for a cigarette because "he knows I smoke." When asked how Anthony would know Juror No. 7 smokes, she explained he had seen the jurors smoking previously.

Regarding the contact, Juror No. 7 stated it was very brief and consisted of him asking for the cigarette and Juror No. 7 telling him the brand she smoked. The record is unclear as to whether the conversation took place while she was inside of her truck or after she had exited. After she exited her truck, she entered the courthouse. When asked if Anthony was "smoking his cigarette that you gave him near you," the juror replied, "He was up against the wall." She believed Anthony entered the courthouse behind her but she was not sure.

At the time of the contact, Juror No. 7 did not know Anthony was a member of defendant's family, although she had seen him in the courtroom. Juror No. 7 denied having any further conversation with Anthony or smoking a cigarette with him. During the inquiry Juror No. 7 mentioned Anthony had asked her for a lighter on a previous occasion. She explained she often goes outside to smoke with another juror on breaks, but she had not noticed Anthony outside when she was smoking. On the prior occasion when he asked her for a lighter, there was no further conversation. Juror No. 7 stated she had never discussed the case with Anthony.

Subsequently, the court inquired of Investigator Bunch regarding what he had observed. He noted the two were talking and laughing as he walked by into the courthouse. The two then followed each other into the courthouse. He did not observe any cigarettes when he walked by. He explained his observation was brief, but he did notice the two interacting with each other and laughing. He could not hear the content of the conversation. He did not see any cigarettes or exchange

---

[6] She is alternatively referred to as Millie Harper and Millie Garcia in the record. Due to the confusion, we will refer to her as Millie throughout the remainder of the opinion. No disrespect is intended.

[7] According to the record, Anthony is Millie's son. Millie is the wife or girlfriend of defendant's brother.

of cigarettes, although that could have happened before he saw them. When questioned further regarding the details of the interaction between the two, Bunch explained he first saw Anthony talking and then Juror No. 7 interacting and then the two laughed.

During the hearing the prosecutor also questioned Bunch regarding a recorded jail telephone call which took place between defendant, Millie, and Anthony. Bunch explained he reviewed a copy of the recording he had received. During the call, defendant attempted to describe a juror with whom he had been making eye contact and exchanging gestures. It appeared defendant was attempting to identify the juror to Anthony. When the prosecutor asked Bunch to relay the physical features of the juror defendant had described to Anthony, the court interrupted the questioning and explained its

> "concern is not with whether or not [defendant] thinks that some of the jurors—one, two or more of them, are on his side. My concern is more that a member of the defendant's family has made, on two occasions, contact with a juror member. I wanted to hear the nature of the conversations so that I could know if there was something being said about a juror trying to contact a juror, or anything like that. Was there any conversation about anyone trying to contact a juror?"

Bunch responded "No, ma'am."

At this point the prosecutor explained that her

> "concern is that if there was a conversation between [defendant] and Anthony, just last night, about whatever they think about whatever juror, and [defendant] describes the juror to Anthony in a way where now Anthony knows who he thinks might be on their side or whatever, I don't care if she is or not, my point is then Anthony is now making contact with somebody he believes is going their way, and I think with a malicious intent to sway that juror. Whether it's to gain some sort of favor or common ground because they both smoke, share a laugh, whatever it is, it's improper and it's an attempt to bias a juror. And that's why I wanted the physical description given by [defendant], because he could be describing somebody else that doesn't even have to do with Miss—well, juror number seven, for the record. And that's my concern. And if that's happening, then what's going on here is a direction without spoken words. And maybe it's not coming from [defendant], maybe it's coming from Anthony, but regardless of where it's coming from, it should not happen. And I'm deeply concerned now that she is both tainted and there's been an attempt to sway her or bias her in a particular direction, and I think she should be removed.

> "And not only that, it appears from investigator Bunch's accounting of what he observed, granted he did not hear content, that there's a difference in facts than what the juror has now told us. And I don't blame her if there is a difference, I'm saying she's probably feeling really uncomfortable, and—but she clearly did not say, you know—it appeared to me, and maybe we could clarify with her, that she just gave him a cigarette, he lit up a cigarette and went and stood by the wall, and that's not what we're hearing happened here."

Subsequently the court gave its tentative ruling, noting Anthony had been present in court every day since the beginning of trial. The court explained,

> "My concern, if he is a member of [defendant's] family, is that he's attempting to make contact with our jurors. And I think even an ordinary citizen, having not been instructed not to, would know that's improper. I'm not really, at this point, not having heard the conversation, real concerned about the connection between the call and this juror. My concern is that we've got a member of the defendant's family attempting to make contact with the jurors on more than one occasion. He does not appear to be a gentleman who's in need of a cigarette, in my view. He comes to court everyday in a suit, he's here on time every time. He could ask anybody else on the sidewalk for a cigarette or a lighter. I don't know why he's approaching our juror or jurors. I do think that's improper. And my tentative ruling is to excuse the juror, admonish that—admonish or banish him from the courtroom, 'cause I don't want this to happen again."

Defense counsel objected to the removal of the juror, arguing "this doesn't reach the bias sort of standard that we use for removing jurors." The court stated: "My concern is his twice now approaching the juror, and that's what she said. She said that he asked her for a cigarette today and on a prior occasion asked her for a lighter. That's not proper. And I can't have that going on." The court stated it would remove Juror No. 7 and replace her with a randomly selected alternate.

Defense counsel once again objected, stating she did not "think this was an appropriate reason to replace number seven, and my concern is that this is being done because there are conversations overheard where people thought that the prosecution thought that maybe juror number seven was on the defense side and I will make—end my comments with that." In response, the court noted,

> "We haven't yet heard the conversation in its entirety. I've indicated that I'm not concerned about whether or not [defendant] feels that he's got juror number four or seven or eight, or whoever it is, on his side. My concern is that there's a member of the [defendant's] family attempting to make contact with the jurors. And if that juror has been twice contacted by him, what she indicates as a conversation does not appear to be the same that Investigator Bunch says that he saw. I don't know which is accurate, but the fact of the contact remains, and one of them went unviewed. I don't know if there's any other members of the jury that he's attempted to contact, but if the rule is if you contact a juror and the juror's going to be gone, perhaps we won't have this problem again. I can't take the chance that they're out there talking about the case or that he's going to try to approach her again or something like that. So she's going to be released. I understand your concern, but I can't have members of the audience contacting the juror. That's not proper."

Juror No. 7 was returned to the courtroom where the court asked a few clarifying questions, then informed her she would be released. The court explained the juror was not being faulted for the contact. Juror No. 7 was replaced with an alternate juror.

### Analysis

While a defendant has a fundamental constitutional right to be tried by a fair and impartial jury (*Irvin v. Dowd* (1961) 366 U.S. 717, 722), that right does not entitle a defendant to a jury composed of any particular individuals. (*People v. Hamilton*

(1963) 60 Cal.2d 105, 128, disapproved on other grounds in *People v. Daniels* (1991) 52 Cal.3d 815, 866 and *People v. Morse* (1964) 60 Cal.2d 631.) Indeed, section 1089 allows for the removal and substitution of a juror for "good cause." Removing a juror pursuant to section 1089 "does not offend constitutional proscriptions." (*People v. Collins* (1976) 17 Cal.3d 687, 691, superseded by statute on other grounds in *People v. Boyette* (2002) 29 Cal.4th 381, 462.) "We review a trial court's decision to discharge a juror under an abuse of discretion standard, and will uphold such decision if the record supports the juror's disqualification as a demonstrable reality." (*People v. Wilson* (2008) 43 Cal.4th 1, 26, citing *People v. Barnwell* (2007) 41 Cal.4th 1038, 1052–1053.)

Defendant argues the trial court violated section 1089 by removing the juror in this case, as the record does not demonstrate the juror committed any misconduct or was biased in any way. Defendant further argues the trial court erred in failing to make an adequate investigation into the matter.

We need not determine whether the trial court erred in dismissing Juror No. 7 because even if we were to find error, we find no prejudice. In *People v. Howard* (1930) 211 Cal. 322, disapproved on other grounds by *People v. Thomas* (1945) 25 Cal.2d 880, 905 and *People v. Sheran* (1957) 49 Cal.2d 101, 108, our Supreme Court found replacing a juror with an alternate did not constitute prejudicial error even though the substitution violated section 1089 at the time. The court noted the substitution was "an irregularity which in no way substantially affected the defendant's rights." (*People v. Howard, supra,* at p. 325.) The court explained the alternate juror participated in the same voir dire proceedings, was subjected to the same challenges, and took the same oath as the other jurors. Therefore, the court could assume the defendant did not find the alternate objectionable and was satisfied the alternate could be fair and impartial should he be substituted for one of the other jurors. (*Id.* at pp. 324–325.) Consequently the court found no prejudice in the substitution. (*Ibid.*)

Indeed, as one court has stated, "It is long-established law in California that where an alternate juror, approved by defendant in voir dire, is allowed to deliberate on the jury panel, the defendant bears a heavy burden to demonstrate that he was somehow harmed thereby." (*People v. Hall* (1979) 95 Cal.App.3d 299, 307; see *People v. Hamilton, supra,* 60 Cal.2d at p. 127; *People v. Bowers* (2001) 87 Cal.App.4th 722, 735–736 [error in excusing juror without good cause is reversible only if defendant is prejudiced thereby].)

Defendant argues he was in fact prejudiced by the dismissal of Juror No. 7. He claims that "although no specific evidence was elicited that Juror No. 7 favored the defense, such concern was certainly the prosecution's worry." The prosecutor "implied there was a danger the juror had been swayed or biased because the non-juror contact was someone who was a part of [defendant's] extended family." In support defendant relies upon *People v. Hamilton, supra,* 60 Cal.2d 105 and *People v. Hernandez* (2003) 30 Cal.4th 1. We find both cases distinguishable.

In *People v. Hamilton,* the Supreme Court found the removal of the juror during the penalty phase of trial was without good cause as there was no basis for concluding her conduct demonstrated misconduct or an inability to perform her duties. As such, the juror's dismissal violated section 1089. (*People v. Hamilton, supra,* 60 Cal.2d at p. 126.) The court subsequently considered whether the dismissal was prejudicial. After reviewing cases determining the erroneous removal was harmless, the court explained there was no showing in those cases the removed juror was "more favorable to one side or the other." (*Id.* at p. 127.)

23

However, the situation was quite different in *Hamilton* where the removed juror " 'had disclosed her opposition to a verdict imposing the death penalty.' " (*Id.* at p. 128.) Consequently, her removal was obviously prejudicial to the defense. The court explained:

> "While it has been said repeatedly, in the cases cited above, that a defendant is not entitled to be tried by a jury composed of any particular individuals, but only by a jury composed of qualified and impartial jurors, this does not mean that either side is entitled to have removed from the panel any qualified and acting juror who, *by some act or remark made during the trial, has given the impression that he favors one side or the other.* It is obvious that it would be error to discharge a juror for such a reason, and that, if the record shows (as it does here), that, based on the evidence, that juror was inclined toward one side, the error in removing such a juror would be prejudicial to that side. If it were not, the court could 'load' the jury one way or the other." (*People v. Hamilton, supra,* 60 Cal.2d at p. 128, italics added.)

In *People v. Hernandez, supra,* 30 Cal.4th 1, the court addressed whether the erroneous dismissal of a juror pursuant to section 1089 and the substitution with an alternate would bar a retrial. The Court of Appeal had determined the removal of the juror was prejudicial to the defense. On review by the Supreme Court, the court "for purposes of ... review" accepted the appellate court finding regarding prejudice. (*Hernandez,* at p. 4.) However, the court did explain the appellate court's ruling was based on the removal of a juror " 'who seemed inclined to give serious consideration to the testimony of the defense witnesses.' " (*Id.* at p. 10.) Thus, the court upheld the appellate court's ruling that the removal was prejudicial.

Our review of other cases requiring reversal due to an error from improperly dismissing a juror all demonstrated facts in which the prejudice to the defense from removing the juror was obvious. (See, e.g., *People v. Wilson* (2008) 44 Cal.4th 758, 813–814, 841 [removal of sole holdout juror for life sentence in penalty phase of trial found prejudicial]; *People v. Cleveland* (2001) 25 Cal.4th 466, 486 [error in removing deliberating juror prejudicial where evidence showed juror was in favor of acquittal]; *People v. Delamora* (1996) 48 Cal.App.4th 1850, 1856 [error in removing jurors prejudicial where jury was deadlocked prior to removal but quickly reached verdict to convict after substitution with alternate jurors].)

Unlike the situations in *Hamilton* and *Hernandez,* there is no evidence on the record demonstrating Juror No. 7 favored one side or the other. Indeed, Juror No. 7 never expressed any sentiments about the case whatsoever. Defendant's argument seems to be centered upon the fact the prosecutor asked that Juror No. 7 be removed because of the fear she had been biased by the contact with defendant's family member. But there was absolutely no evidence on the record indicating Juror No. 7 preferred one side over the other. There is no indication on the record Juror No. 7 ever made any comments or engaged in any nonverbal behavior indicating a preference for one side. There was some minimal discussion regarding the telephone call between defendant and Anthony regarding defendant's efforts to describe a juror. But there was no evidence as to whether that juror was favorable to one side, any evidence as to why defendant may have believed the juror favored one side, or any evidence as to who that juror was. While there was some evidence as recounted from listening to the telephone call that defendant had made eye contact with a juror, there was no evidence presented

as to which juror that was, nor any evidence establishing the juror leaned to one side or the other. Thus, any argument that Juror No. 7 expressed an inclination as to one side or the other in this case is completely unsupported by the record and would consist of pure speculation.

Rather, this case is more similar to *People v. Abbott* (1956) 47 Cal.2d 362, which was cited in *Hamilton*. There, during trial, the court learned one of the jurors worked at the same office as the defendant's brother. The two worked in close physical proximity. (*Id.* at p. 370.) As a result, the court inquired of the juror, learning that although the juror worked near the defendant's brother, he had never spoken to the brother and did not know who he was until he was pointed out in court. (*Id.* at pp. 370–371.) He stated he had never discussed the case with anyone and believed he could be fair and impartial; he did not want to be relieved from the jury. The trial court removed the juror due to the proximity at work between the juror and the defendant's brother and to save the juror from embarrassment or criticism. (*Id.* at p. 371.) Initially the Supreme Court found the removal of the juror was for good cause, but further declared there was no prejudice to the defendant from the removal of the juror and the substitution with an alternate. (*Id.* at pp. 371–372.) The court explained the alternate was fully examined and accepted by both sides, was part of the jury since the beginning of trial, and there was no claim he could not render a fair verdict. (*Ibid.*)

Likewise here, the alternate juror was examined and accepted by both sides, was a member of the jury from the beginning of trial, and defendant does not claim the alternate was biased in any way against either side. Importantly, there was no evidence Juror No. 7 in any way favored one side, nor was there any evidence the substituted alternate was anything but fair and impartial. As such, we find no prejudice from the removal. (See *People v. Cleveland, supra,* 25 Cal.4th at p. 486; *People v. Bowers, supra,* 87 Cal.App.4th at pp. 735–736.)

To the extent defendant argues the error also violated his constitutional right to a jury trial, we reject his claim. Defendant's entire argument relies upon a brief citation to two cases, *Downum v. United States* (1963) 372 U.S. 734 (*Downum*) and *Crist v. Bretz* (1978) 437 U.S. 28, 35–36 (*Crist*). Both cases dealt with the dismissal of an entire jury panel without good cause and without reaching a verdict. (*Downum, supra,* at p. 735; *Crist, supra,* at pp. 29–30.) In both instances the Supreme Court found the empaneling of a new jury after the first had been discharged without reaching a verdict to be a violation of double jeopardy. (*Downum, supra,* at pp. 737–738; *Crist, supra,* at pp. 35–38.)

However, our Supreme Court has held the dismissal of a single juror and replacement with an alternate does not implicate double jeopardy concerns. (*People v. Hernandez, supra,* 30 Cal.4th at pp. 10–11.) The court explained the right the high court sought to protect in *Crist* was the right of " 'an accused in retaining a chosen jury.' " (*Id.* at p. 8, quoting *Crist, supra,* 437 U.S. at pp. 35–36.) The court explained that right was not violated when the "defendant's chosen jury was not discharged but instead, with the substitution of a preselected alternate juror, remained intact until a verdict was rendered." (*People v. Hernandez, supra,* at p. 9.) In reaching this conclusion, the court relied upon *People v. Burns* (1948) 84 Cal.App.2d 18.

In *Burns,* the court addressed the situation where a court improperly dismissed a juror pursuant to section 1089. The defendant claimed the dismissal of that juror, in violation of section 1089, caused him to be placed in front of two different

juries, thereby implicating the double jeopardy clause. In rejecting the claim, the court explained:

> "[A] verdict by 12 jurors, one of whom was originally an alternate juror, is the verdict of the jury originally sworn to try the case. If the substitution of the alternate for one of the regular jurors is in accordance with the provisions of ... section 1089 no question of double jeopardy would arise. This can only be true if the substitution of the alternate for the regular juror does not destroy the unity of the jury. It does not destroy the unity of the jury because the jury is not complete until the alternate is accepted and sworn and the alternate is at all times a potential member of the regular jury. [¶] The requirement of trial by one jury is satisfied, where a jury composed of 12 regular jurors and one or more alternates has been impaneled, if the verdict is returned by 12 jurors sworn to try the case although one or more alternates may be included in the jury which renders the verdict. If this is true where the substitution has been made in the manner provided by ... section 1089 it must be true where it has been made in an irregular manner. The same number of jurors sworn to try the case in the same way are involved in either instance. Either the substitution of an alternate for a regular juror destroys the unity of the jury or it does not. If it does not destroy the unity of the jury ..., then the substitution of an alternate for a regular juror in an unauthorized manner does not place the defendant twice in jeopardy but is merely an error of law which should not lead to a reversal in the absence of a showing that it has resulted in a miscarriage of justice under article VI, section 4 1/2 of the Constitution." (*People v. Burns, supra,* 84 Cal.App.2d at pp. 32–33.)

> As the *Burns* court explained, a defendant's right to the original jury sworn to try the defendant's case is not destroyed by the substitution of an alternate. This principle was reaffirmed in *People v. Hernandez, supra,* 30 Cal.4th at page 9. Therefore, we find no violation of defendant's right in retaining his chosen jury through the substitution of an alternate juror here.

Harper, 2014 WL 2886291, at *2–8 (footnotes in original).

Here, the California Court of Appeal found that it need not determine whether the trial court erred in dismissing Juror No. 7 because there was no prejudice. The Supreme Court has held that "when a state court determines that a constitutional violation is harmless, a federal court may not award habeas relief under § 2254 unless *the harmlessness determination itself* was unreasonable." Fry v. Pliler, 551 U.S. 112, 119 (2007) (citing Mitchell v. Esparza, 540 U.S. 12 (2003) (per curiam)); Ayala, 135 S. Ct. at 2199. "[T]he test for determining whether a constitutional error is harmless . . . is whether it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" Neder v. United States, 527 U.S. 1, 15 (1999) (quoting Chapman v. California, 386 U.S. 18, 24 (1967)).

///

> The Sixth Amendment guarantees a criminal defendant the right to a "fair trial by a panel of impartial, indifferent jurors." *Irvin v. Dowd,* 366 U.S. 717, 722, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961) (internal quotation marks and citations omitted). The Sixth Amendment does not entitle a defendant to require retention of a biased juror. Instead, a defendant is only entitled to a jury composed of "jurors who will conscientiously apply the law and find the facts," *Lockhart v. McCree,* 476 U.S. 162, 178, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986), and that is "capable and willing to decide the case solely on the evidence before it," *McDonough Power Equip., Inc. v. Greenwood,* 464 U.S. 548, 554, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984) (internal quotation marks omitted).

Bell v. Uribe, 748 F.3d 857, 868–69 (9th Cir. 2014). Here, the California Court of Appeal's harmless error determination was not objectively unreasonable. Although Petitioner argues that the dismissal of Juror No. 7 was erroneous,[8] Petitioner does not establish that any member of the final jury panel was not impartial or unable to conscientiously apply the law and find the facts solely based on the evidence before them.

Based on the foregoing, the Court finds that the state court's harmless error determination regarding the dismissal of Juror No. 7 was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of fact. The decision was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." Richter, 562 U.S. at 103. Accordingly, Petitioner is not entitled to habeas relief on his fourth claim, and it should be denied.

**V.**

**RECOMMENDATION**

Accordingly, the undersigned HEREBY RECOMMENDS that the petition for writ of habeas corpus be DENIED.

---

[8] The Court notes that the Ninth Circuit has "consistently held that 'the California substitution procedure' outlined in California Penal Code § 1089 'preserve[s] the "essential feature" of the jury required by the Sixth and Fourteenth Amendments,'" thus confirming that "California Penal Code § 1089 is not deficient in terms of protecting a defendant's Sixth Amendment right to an impartial jury." Bell, 748 F.3d at 867–68 (alteration in original) (quoting Miller v. Stagner, 757 F.2d 988, 995 (9th Cir. 1985)). Additionally, the Ninth Circuit is not aware of any Supreme Court case holding that "the dismissal of a juror violates the Sixth Amendment when it is 'reasonably possible that the impetus for [the juror's] dismissal came from her position on the merits of the case.'" Williams v. Johnson, 840 F.3d 1006, 1009 (9th Cir. 2016) (alteration in original) (citing United States v. Symington, 195 F.3d 1080, 1088 (9th Cir. 1999)).

This Findings and Recommendation is submitted to the assigned United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within **THIRTY (30) days** after service of the Findings and Recommendation, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the objections shall be served and filed within fourteen (14) days after service of the objections. The assigned United States District Court Judge will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Wilkerson v. Wheeler, 772 F.3d 834, 839 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated: __**February 26, 2019**__          /s/ Erica P. Groi

          UNITED STATES MAGISTRATE JUDGE